**Rhonda MAYSE and Anita Harden, Plaintiffs,**

v.

**PROTECTIVE AGENCY, INC., and John L. McLean, Defendants.**

**No. C–C–87–320–M.**

United States District Court, W.D. North Carolina, Charlotte Division.

July 18, 1991.

Jonathan Wallas, Charlotte, N.C., for plaintiffs.

Philip M. VanHoy, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### PROCEDURAL HISTORY

This employment discrimination case, brought by two black women against their white former employer, was tried from February 25, 1991 to March 4, 1991. The claims submitted to the jury included plaintiff Mayse's claims under the common law: 1) that defendants had terminated Mayse's employment in bad faith in contravention of the public policy of North Carolina; 2) that defendants had intentionally caused Mayse to suffer extreme emotional distress; and 3) that Mayse was entitled to actual and punitive damages because of defendants' wrongful conduct. Also submitted to the jury were plaintiff Harden's claims under 42 U.S.C. § 1981: 1) that defendants had refused to hire Harden because of her race; and 2) that Harden was entitled to actual and punitive damages because of defendants' wrongful conduct.

Plaintiff Mayse's claim, under Title VII, that defendants had demoted her and subsequently terminated her employment because of her race was tried to the court.

On March 4, 1991, the jury returned its verdict, answering each of the issues presented to it in favor of defendants.

On April 22, 1991, plaintiffs filed a motion for a new trial, and plaintiff Mayse filed a motion for Title VII relief.

On May 20, 1991, defendants filed a memorandum in response to plaintiffs' post-trial motions.

On June 7, 1991, plaintiffs filed a reply.

### FACTS

Defendant Protective Agency, Inc. ("Protective") is an insurance agency with its home office in Lumberton, North Carolina. During the time period at issue in this case, Protective also had an office in Charlotte, North Carolina.

Defendant John L. McLean is the owner of Protective. His son, John P. McLean, and his daughter, Marshall Daniel, work for Protective.

In October, 1986, defendants hired plaintiff Rhonda Mayse to work as a clerk in Protective's Charlotte office. The words "sound good—black?" were written on Mayse's employment application by Marshall Daniel. Plaintiffs' Exhibit ("PX") 31.

In December, 1986, Mayse was promoted to the position of office manager.

On January 7, 1987, Marshall Daniel wrote a letter to her father, John L. McLean. The letter was admitted into evidence as PX–54.

In PX–54, Marshall Daniel made suggestions to her father about how to attract more competent employees to the Charlotte office in order to "turn this office around." In PX–54, Marshall Daniel also told her father that, "Rhonda [Mayse] is the best manager you have had in [Charlotte]," and that, "[Y]ou should put another ad in the paper—the reason is most of these colleges are only going to send black people."

On January 12, 1987, John L. McLean wrote a letter to a Mrs. Sue Hampton of AAA Employment Agency. That letter was admitted into evidence as PX–1.

In PX–1, John L. McLean wrote:

"4. Our best prospects have, without exception, [come] from selecting smart and energetic young women, that have the real desire to work and improve themselves—they must have managerial ability.... We have had great success with all races, but we already have two blacks in this Office now so we would like for the additions not to be black."

Paragraph 4 of Protective's file copy of PX–1 was later annotated with the handwritten note that, "We hired Anita Dumas, because they said she was real special qual-

ified," and with the typed post-script, "We hired Anita Dumas (Black), because AAA told us she showed special qualifications. We hired her, then she quit 1–30–87 worked only 14 days."

Near the bottom of PX–1, appear the letters "JLM/aa" (presumably meaning typed for John L. McLean by someone with the initials "aa").

On January 15, 1987, John P. McLean sent a memorandum to his father entitled "Note to JLM:/Re: Charlotte Office—Employment." That memorandum was admitted into evidence as PX–58, and reads as follows:

> "JPM talked with Lori Bumgardner with Tripple [sic] A Employment Agency today and she is sending a girl in there this afternoon for Rhonda to interview. Rhonda already new [sic] about this. This girl is a colored girl and i told lori that we would like for her to send us a white girl or two to interview. She said she would do this for us. She said this other girl is very qualified and had been to Johnson C. Smith University so she had a degree. It sounds to me like maybe over qualified but we want to see what Rhonda and them have to say about her.
>
> "Thank you.
>
> JPM"

Typed on the upper right-hand portion of the memorandum, under the letterhead of Protective's Lumberton office, is "1–15–87 aa" (presumably meaning typed on January 15, 1987, by someone with the initials "aa").

At trial, John P. McLean denied having previously seen PX–58, and defendants contend that the exhibit lacks foundation. The court, however, possesses no serious doubt as to the authenticity of PX–58, and finds,

as it found at trial, that PX–58 is admissible.[1]

On January 15, 1987, plaintiff Anita Harden applied for a position with Protective. PX–43. Harden testified that she learned of the position through the Employment Security Commission. She testified that on the first day she went to the Commission, an employment agent pulled up a listing for a company that turned out to be Protective. The agent, in Harden's presence, called Protective, and, according to Harden, became agitated and stated, "That's discrimination." After hanging up the phone, the agent informed Harden that someone at Protective had told the agent that Protective did not wish to hire a black person to fill its job vacancy.

Plaintiff Mayse testified that *she*, under orders from John L. McLean, was the person at Protective who told the employment agent that Protective did not wish to hire a black person at that time.[2]

Plaintiff Harden testified that she returned to the Employment Security Commission the following day, and that the employment agent pulled up what they thought was another job listing. However, the listing turned out once again to be for the job at Protective. Harden testified that she had the agent call anyway, and managed to set up an interview.

Plaintiff Mayse testified that she interviewed Harden and determined that Harden was qualified for the job, but that Harden was not hired solely because she was black.

Marshall Daniel attended the deposition of plaintiff Harden. Daniel was deposed *after* Harden was deposed. Daniel stated in her deposition that she did not remember Harden's applying for a job at Protective.

Plaintiff Mayse, however, had retained Harden's application when Mayse had left

1. On March 8, 1991, Jonathan Wallas, counsel for plaintiffs, filed an affidavit in which he stated, under oath, that PX–58 "was obtained from the defendants in the discovery process." In the absence of any evidence to the contrary, and in light of counsel's affidavit and other indicia of the document's authenticity, the court finds that PX–58 was so obtained.

2. The statements of the employment agent were not admitted "to prove the truth of the matter asserted," but rather to show their effect upon Harden. Statements made by Mayse on behalf of defendant Protective are also non-hearsay admissions by a party-opponent under Rule 801(d)(2) of the Federal Rules of Evidence.

Protective. When the application was supplied to defendants during discovery, Daniel supplemented her deposition testimony based upon her recollection as refreshed by Harden's application.

Marshall Daniel testified at trial that *she* had interviewed Harden and that Daniel and Mayse had jointly decided not to hire Harden. In explaining the decision not to hire Harden, Daniel stated that the job required overtime work, that Harden did not own a car, and that *Daniel* would not have wanted to take a bus home from Protective after normal working hours.

Harden testified at trial that there was a bus stop within a block of Protective's Charlotte office, and that she would not have objected to taking a bus home from Protective after working overtime.

On January 17, 1987, Anita Dumas applied for a position with Protective. PX–42.

On January 19, 1987, Protective hired Anita Dumas.

On February 4, 1987, Anita Dumas resigned from her position at Protective.

On February 7, 1987, plaintiff Mayse was demoted back to her clerical position.

On March 3, 1987 John L. McLean wrote a letter to a Ms. Dorothrea Munnerlyn. In that letter, admitted into evidence as PX–21, Mr. McLean wrote:

"Dear D.

"1. Lynda told me that I could call you "D". As I told her, we have had tough luck in trying to get good help in our insurance office in Charlotte. We need a young lady age 23 to 30 preferably. Also, we will have to tell you white, because we have had such disastrous experiences with blacks in Charlotte.

"2. They must be able to type 25 words per minute and up, and white because we have had such terrible experiences in Charlotte in the past with the blacks.

"3. We never know when we might need someone, and right now we think we will possible [sic] need someone right away...."

Two days later, on March 5, 1987, Protective terminated plaintiff Mayse's employment.

On March 6, 1987, Mayse filed a charge of discrimination with the EEOC. Plaintiff Mayse stated in her EEOC charge, admitted into evidence as PX–30, that:

"On or about January 14, 1987 I was instructed by John McLean, Sr., Owner (White) not to hire a black for a vacant clerical position because the Company had two Blacks including myself already on the staff. Mr. McLean wrote a letter to AAA Employment Agency indicating the same however, on January 19, 1987 Anita Dumas, Black was referred by the agency for the job and after interviewing her I was very impressed with her qualifications. I later spoke with Mr. McLean and advised that their [sic] had been no White applicants for the position but that I was very impressed with the interview that I had with Anita and would like to hire her. He finally consented to hiring Anita and shortly after she came on board she started being constantly harassed about her performance and accused of making errors that she had not made. Subsequently, on February 5, 1987 Mr. McLean instructed me to terminate Anita and I inturn [sic] gave him all the reasons why I felt Anita should not be terminated. Anita overheard this conversation and resigned her position and on February 7, 1987 I was advised that I had been demoted. It is my belief that had I terminated this employee as instructed that I would not have been demoted or terminated."

On March 9, 1987, Anita Dumas filed a charge of discrimination. In her EEOC charge (PX–33), Anita Dumas stated:

"I was hired by [Protective] on January 19, 1987 as an Insurance Agent. On or about January 29, 1987 I started being constantly harassed and on February 4, 1987 I was forced to resign my position."

On March 16, 1987, John L. McLean wrote a letter to the EEOC in response to the discrimination charges filed by plaintiff Mayse and Anita Dumas. In that letter, McLean stated that, "We wanted a white

or Indian since we had all blacks." PX–16B.

This case came to trial on February 25, 1991. Each side was allowed four peremptory challenges, and each side used all of its peremptory challenges. Defendants used three of their four peremptory challenges to exclude *all* of the three black venirepersons who were placed in the jury box as potential jurors.

## PLAINTIFFS' MOTION FOR A NEW TRIAL

Plaintiffs offer three basic arguments in support of their motion for a new trial:

1) That the court's instructions to the jury were erroneous and confusing;

2) That defendants' allegedly discriminatory use of peremptory challenges resulted in a biased jury that failed to give adequate consideration to evidence of racially motivated actions on the part of defendants; and

3) That the jury's verdict was against the clear weight of the evidence, would result in a miscarriage of justice, and shocks the conscience.

## JURY INSTRUCTIONS

■ The court finds plaintiffs' claim that the court's instructions to the jury were "contradictory" and "confusing" to be without merit. Furthermore, plaintiffs waived that objection by failing to make it at trial. Fed.R.Civ.P. 51.

## PEREMPTORY CHALLENGES

■ On January 15, 1991 (several weeks before this case was tried), the United States Supreme Court heard oral argument in *Edmonson v. Leesville Concrete Co.*, — U.S. —, 111 S.Ct. 2077, 114 L.Ed.2d 660. That case presented the question whether private litigants in a civil case may constitutionally use peremptory challenges to exclude jurors on account of their race.

On June 3, 1991, the Court held, by a 6–3 margin, that a private litigant *cannot* use peremptory challenges to exclude jurors on account of their race without violating the Constitution.

The court believes that plaintiffs in this case have made a *prima facie* showing of a racially discriminatory use of peremptory challenges by defendants. Plaintiffs are black; defendants are a white man and a white-owned corporation; and defendants used three of their four peremptory challenges to excuse *all* of the three black venirepersons who were placed in the jury box. Moreover, to the court's best recollection, one or more of the black venirepersons were excused after only cursory examination or no examination at all by defense counsel.

Although plaintiffs' objection to defendants' use of peremptory challenges may have some merit, the court believes that objection was waived by plaintiffs' failure to raise it at trial.

In *Edmonson*, the plaintiff, "who is himself black, requested that the District Court require [the defendant] to articulate a race-neutral explanation for striking the two jurors." In this case, plaintiffs made no such request. Had plaintiffs done so, the court could have asked defendant to articulate a race-neutral explanation for the challenges, and the court could have evaluated that explanation.

The court is somewhat uncomfortable in holding that plaintiffs waived an argument before any decision of the Supreme Court had made that argument viable. However, the court was aware, at the time of this trial, that the constitutionality of racially motivated peremptory challenges in a civil case had been argued before the Supreme Court; and the court can only assume that, as experienced civil rights lawyers, plaintiffs' counsel were similarly aware. The probable correctness of the court's assumption is evidenced by plaintiffs' discussion of *Edmonson* on pages 12 through 13 of plaintiffs' memorandum in support of post-trial motions, filed April 22, 1991 (approximately six weeks before the Supreme Court issued its decision).

Because plaintiffs failed to raise this objection at trial, the court will not consider it now. *See Clark v. Newport News Ship-building, et al.*, 937 F.2d 934 (4th Cir.1991)

(objection to racially motivated peremptory challenges in civil case deemed waived on appeal by failure to raise timely objection at trial).

## THE WEIGHT OF THE EVIDENCE

"[A] trial judge has a duty to set aside a verdict and grant a new trial even though it is supported by substantial evidence, 'if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false or will result in a miscarriage of justice.'" *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891–92 (4th Cir.1980) (additional citations omitted). In addition, if a jury's verdict "shock[s] the conscience of the Court" and is the product of "passion, sympathy or prejudice," a new trial is appropriate. *Scagnelli v. Whiting*, 554 F.Supp. 77, 82 (M.D.N.C.1982), *citing Ford Motor Co. v. Mahone*, 205 F.2d 267, 272 (4th Cir.1953); 11 C. Wright & A. Miller, *Federal Practice & Procedure* §§ 2807, 2815 (1973).

In deciding whether to grant a new trial, "the district court may weigh evidence and assess credibility." *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985).

The *documentary* evidence of racial discrimination in this case is overwhelming. In twenty-three years on the federal bench, this court has rarely, if ever, presided over a case in which defendants have so thoroughly *committed to writing* their discriminatory intent.

Although the documentary evidence of discriminatory intent on the part of defendants is detailed above, a brief summary appears to be in order.

Defendant John L. McLean, the owner of defendant Protective, made the following racially discriminatory statements *in writing:*

1. "We have had great success with all races, but we already have two blacks in this Office now so we would like for the additions not to be black";

2. "We hired Anita Dumas (Black), because AAA told us she showed special qualifications";

3. "We hired Anita Dumas, because they said she was real special qualified";

4. "We need a young lady age 23 to 30 preferably. Also, we will have to tell you white, because we have had such disastrous experiences with blacks in Charlotte";

5. "They must be able to type 25 words per minute and up, and white because we have had such terrible experiences in Charlotte in the past with the blacks"; and

6. "We wanted a white or Indian since we had all blacks."

Marshall Daniel, John L. McLean's daughter and an employee of Protective with supervisory authority over plaintiffs, made the following racially motivated statements *in writing:*

1. "sound good—black?"; and

2. "[Y]ou should put another ad in the paper—the reason is most of these colleges are only going to send black people."

John P. McLean, John L. McLean's son and an employee of Protective, stated, in a *written* memorandum to his father:

"JPM talked with Lori Bumgardner with Tripple [sic] A Employment Agency today and she is sending a girl in there this afternoon for Rhonda to interview. Rhonda already new [sic] about this. This girl is a colored girl and i told lori that we would like for her to send us a white girl or two to interview. She said she would do this for us. She said this other girl is very qualified and had been to Johnson C. Smith University so she had a degree. It sounds to me like maybe over qualified but we want to see what Rhonda and them have to say about her."

Defendants admit that "various documents indicat[e] that racial considerations entered into some employment decisions of the defendants," Defendants' Memorandum in Response to Plaintiffs' Post–Trial Motions at 24, but contend that plaintiffs Mayse and Harden were not disadvantaged for racial reasons. Although the jury apparently found this argument to be persuasive, the court finds the jury's conclu-

sion to be against the clear weight of the evidence.

The court does not lightly set aside a jury verdict. As the court has stated on numerous occasions during the course of this and other trials, the court has a firm belief in the ability of juries to resolve complex factual disputes fairly and wisely.

This case, however, presents a rare example of a jury verdict that is not merely unfair and unwise, but is against the clear weight of the evidence, as is demonstrated below. In this exceptional case, the court believes a new trial is warranted.

### HARDEN'S § 1981 CLAIM

■ Plaintiff Mayse testified that defendant John L. McLean told her that he did not wish to hire any more blacks to work in the Charlotte office. Plaintiff Mayse further testified that, under orders from her superiors and at great emotional cost to herself, she told the agent of the Employment Security Commission who called on behalf of plaintiff Harden that Protective did not want to hire a black person to fill its job vacancy. Plaintiff Mayse further testified that plaintiff Harden was well-qualified for the available position, and was not hired solely because she was black.

Mayse's testimony was corroborated at trial by Harden's testimony. More importantly, Mayse's testimony was compellingly corroborated by the documents in which John L. McLean *put into writing* his unwillingness to hire any additional blacks in Protective's Charlotte office.

Marshall Daniel testified that Harden was not hired, in large part, because she did not own a car and the job required overtime work. Harden testified, however, that her lack of a car would not have posed a problem, because Protective's Charlotte office was close to a bus stop.

Furthermore, the credibility of Daniel's testimony on this issue is somewhat suspect. Daniel attended Harden's deposition. *Subsequently*, at Daniel's own deposition, Daniel testified that she had no memory of Harden or Harden's application for employment.

Later, when discovery revealed that Mayse had retained Harden's application for employment and when that application was made available to defendants, Daniel's recollection changed. Daniel testified at trial that she had *interviewed* Harden and that Mayse and Daniel had jointly decided not to hire Harden.

The court finds it difficult to believe that a several-hour confrontation with Harden at Harden's deposition would not have refreshed Daniel's memory of Harden as effectively as a perusal of Harden's application, particularly given Daniel's testimony that she actually interviewed Harden.

■ Defendants contend that because Anita Dumas—who was hired to fill the position for which plaintiff Harden had applied—is black, race could not have been the reason for defendants' failure to hire Harden.

This contention, although logical enough at first glance, is ultimately not persuasive. According to John L. McLean's own written statements, Anita Dumas was hired, despite the fact that she is black, "because AAA told us she showed special qualifications, ... because they said she was real special qualified." PX–1.

■ It is a violation of 42 U.S.C. § 1981 for an employer to refuse to hire a black person absent "special qualifications," above and beyond those which would be required of a white applicant. That Anita Dumas was ultimately hired in no way demonstrates that defendants did not discriminate against Anita Harden. In fact, defendants' stated reason for hiring Anita Dumas (her "special" qualifications) *supports* Harden's claim of discrimination.

In light of the consistency and persuasive power of plaintiffs' testimony, the inconsistency and implausibility of defendants' testimony, and the overwhelming documentary evidence in support of plaintiffs' testimony, the court believes and determines that the jury's finding that defendant's failure to hire plaintiff Harden was not racially motivated was against the clear weight of the evidence.

## MAYSE'S WRONGFUL DISCHARGE CLAIM

Mayse claims, under *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989), that she was terminated in bad faith for refusing to violate North Carolina's policy against racially motivated hiring decisions.

North Carolina General Statute § 143–422.2 (1990) provides, in pertinent part:

"It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees."

■ As a threshold matter, defendants contend that this claim should not have been permitted to go to the jury, on the ground that *Coman* does not apply where a statutory remedy (in this case, Title VII) is available to the plaintiff. In support of this contention, defendants rely on *Amos v. Oakdale Knitting Mills*, 102 N.C.App. 782, 403 S.E.2d 565 (1991), and *Percell v. Int'l Business Machines, Inc.*, 765 F.Supp. 297 (E.D.N.C.1991).

Plaintiffs, conversely, contend that a *Coman* claim may go forward unless a *state* statutory remedy is available to the plaintiff.

The recent case of *Iturbe v. Wandel and Goltermann Technologies, Inc.*, 774 F.Supp. 959 (M.D.N.C.1991) supports plaintiffs' position. In *Iturbe*, the court analyzed *Coman* and its progeny, including *Amos v. Oakdale Knitting Company*, and held that the following two-part test determines whether a *Coman* claim may be pursued:

"(1) the discharge must violate some well established public policy, and (2) there must be *no North Carolina statutory remedy* to protect the interest of the aggrieved employee or society."

*Iturbe*, at 963 (citing *Amos*, 102 N.C.App. at ——, 403 S.E.2d 565). The court further held that Iturbe's claim that she was terminated because of her sex or national origin

stated a cause of action under *Coman* and *Amos*.

Although the court is aware that another district court has decided this issue differently, *see Percell, supra*, the court finds the reasoning of the *Iturbe* court to be persuasive. The court therefore holds, as it did at trial, that plaintiff Mayse may proceed with her *Coman* claim, notwithstanding the availability of a *federal* remedy under Title VII.

■ The jury found that Mayse was not discharged in bad faith in violation of the public policy of North Carolina. This finding also was against the clear weight of the evidence, and warrants a new trial.

Defendants contend that Mayse was demoted, and later discharged, for poor performance.

Plaintiffs contend that Mayse was demoted, and later discharged, for refusing to violate North Carolina's public policy against racially motivated hiring decisions (under *Coman*) and because of her race (under Title VII).

The testimony on the issue of Mayse's performance was in conflict: Defendants and their agents testified that Mayse performed poorly and was told of deficiencies in her performance; Mayse testified that she performed well and received no complaints about her performance.

Again, the documentary evidence is instructive. On January 7, 1987, Marshall Daniel wrote to her father:

"I feel Rhonda is the best manager you have had in here. She told me this morning, she can't continue to work the hours she is working for the salary she's making. She said she was making $7.00 an hour at her last job and the only reason she quit was that she was having to work until 7:00 P.M. She says she is working later than that here and is not being paid for it." PX–54.

On January 19, 1987, Protective hired Anita Dumas. Plaintiff Mayse stated that John L. McLean finally agreed to hire Dumas only after Mayse told him there had been no white applicants for the position. PX–30. Given the extraordinary documen-

tary evidence of John L. McLean's desire to hire "a white or Indian" for the job, the court finds Mayse's statement to be highly credible.

On or about February 4, 1987, Anita Dumas resigned from her position at Protective. Mayse and Dumas testified that Dumas resigned only after she was repeatedly harassed about errors that she had not made, and after Dumas overheard a conversation in which Mayse resisted John L. McLean's instructions that she fire Dumas. In light of the extensive documentary evidence of discrimination and the consistency and apparent sincerity of the testimony of Mayse and Dumas, the court credits plaintiffs' version of these events.

On February 7, 1987, *three days after the resignation of Anita Dumas following Mayse's resistance to firing her,* plaintiff Mayse was demoted back to her clerical position. The clear weight of the evidence supports the inference that Mayse was demoted for her insistence that Protective hire Anita Dumas despite her race, and her unwillingness to fire Anita Dumas because of her race.

On March 3, 1987 John L. McLean wrote a letter to a Ms. Dorothrea Munnerlyn, in which he stated:

"1. ... We need a young lady age 23 to 30 preferably. Also, we will have to tell you white, because we have had such disastrous experiences with blacks in Charlotte.

"2. They must be able to type 25 words per minute and up, and white because we have had such terrible experiences in Charlotte in the past with the blacks.

"3. We never know when we might need someone, and right now we think we will possible [sic] need someone right away...."

Two days later, on March 5, 1987, Protective terminated plaintiff Mayse's employment.

The jury's finding that Mayse was not terminated in bad faith in contravention of the public policy of North Carolina is against the clear weight of the evidence.

## MAYSE'S EMOTIONAL DISTRESS CLAIM

■ The jury found that defendants had not intentionally or recklessly engaged in extreme or outrageous conduct which caused plaintiff Mayse to suffer extreme emotional distress. That finding is also counter to the clear weight of the evidence.

As demonstrated above, the clear weight of the evidence supported the following findings:

1. That Mayse, a black woman, was compelled by defendants to inform the Employment Security Commission that defendants did not wish to hire a black person to fill a vacancy in the Charlotte office;

2. That Mayse was compelled by defendants to deny employment to Anita Harden solely on account of her race;

3. That Mayse was directed to fire Anita Dumas, a black employee who had been hired at Mayse's insistence, without good cause and for racially discriminatory reasons; and

4. That Mayse was demoted, and later fired, in bad faith in contravention of the public policy of North Carolina and for racially discriminatory reasons.

This conduct is certainly "extreme or outrageous," in that it exceeds the bounds of behavior usually tolerated by decent society. *Trought v. Richardson,* 78 N.C.App. 758, 338 S.E.2d 617 (1986).

Moreover, even if defendants did not *intend* for their conduct to cause Mayse to suffer extreme emotional distress, defendants acted in reckless indifference to the likelihood that their conduct would cause Mayse to suffer such harm. *Dickens v. Puryear,* 302 N.C. 437, 276 S.E.2d 325, 335 (1981).

Finally, the testimony by Mayse and others that Mayse in fact suffered extreme emotional distress as the proximate result of defendants' actions was extensive and uncontradicted. Given the conduct in which defendants engaged, it would have been amazing indeed had Mayse *not* suffered extreme emotional distress as a result.

The jury's finding that defendants did not intentionally or recklessly engage in extreme or outrageous conduct which caused plaintiff Mayse to suffer extreme emotional distress is against the clear weight of the evidence.

## MAYSE'S TITLE VII CLAIM

Mayse's Title VII claim was tried to the court, and was not submitted to the jury.

## COLLATERAL ESTOPPEL

■ Defendants contend that, regardless of the merits of this claim, the jury's findings for defendants on Mayse's *Coman* and emotional distress claims require the court to enter a verdict for defendants on Mayse's Title VII claim.

However, in order to bind the court in its resolution of Mayse's Title VII claim, the jury must have explicitly or implicitly determined, in its verdict on Mayse's jury claims, the question whether Mayse was demoted or discharged on account of her race.

The jury's verdict on Mayse's emotional distress claim is clearly not binding on the court in its consideration of Mayse's Title VII claim. In finding for defendants on Mayse's emotional distress claim, the jury could have believed that Mayse was demoted or discharged on account of her race, but found that defendants' conduct was not outrageous, or that Mayse's emotional distress was not extreme.

Nor does the jury's verdict on Mayse's *Coman* claim bind the court in its consideration of the Title VII claim. The *Coman* claim was submitted to the jury in two parts:

1) Did the public policy of North Carolina prohibit defendants from refusing to hire someone because of race? and

2) Was Mayse terminated for refusing to violate that public policy?

Whether Mayse was terminated on account of *her* race was not the question presented to the jury for decision on the *Coman* claim, and the jury's resolution of the *Coman* claim, therefore, is not binding on the court in considering Mayse's Title VII claim.

Moreover, even if the jury *had* determined, in its consideration of the *Coman* claim, that Mayse was not *discharged* because of her race, the jury would not have determined the cause of Mayse's *demotion*. Mayse's Title VII claim alleges that her *demotion* was racially motivated; her *Coman* claim does not.

Finally, even if the jury *had* implicitly resolved the issues presented by Mayse's Title VII claim, the jury's verdict goes against the clear weight of the evidence, and would result in a miscarriage of justice if applied collaterally to estop Mayse's Title VII claim.

## THE MERITS OF MAYSE'S TITLE VII CLAIM

■ The compelling direct evidence of discrimination in this case has been detailed above, and need not be reiterated here. In a Title VII case, such direct evidence of discrimination serves to shift the burden of persuasion to the employer:

"If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved. Defendant cannot refute this evidence by mere articulation of other reasons; the legal standard changes dramatically:

'Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by *proving* by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor.'"

*Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1557 (11th Cir.1983) (citations omitted). *See also Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429, 1434 (4th Cir.1985) (applying similar burden-shifting analysis in ADEA case).

Extensive, credible direct evidence of discrimination on the part of defendants, both documentary and testimonial, was presented in this case (*see* "FACTS" section, *su-*

*pra*). The court finds that racial discrimination was a significant, substantial factor in defendants' decisions to demote, and later discharge, plaintiff Mayse.

Defendants fall far short of their burden of proving that race was not the reason for Mayse's demotion and termination. Defendants' testimony that Mayse was demoted and discharged for poor performance is belied by:

1. Marshall Daniel's January 7, 1987 letter to her father, in which she states, "I feel Rhonda is the best manager you have had in here";

2. Mayse's testimony that her performance was good and that she had received no complaints from defendants about her performance prior to the arrival and forced departure of Anita Dumas;

3. The fact that Mayse was demoted three days after the resignation of Anita Dumas, whose employment Mayse had insisted upon and whose discharge Mayse had resisted;

4. The fact that Mayse was terminated two days after John L. McLean wrote, in a letter to Dorothrea Munnerlyn:

"1. ... We need a young lady age 23 to 30 preferably. Also, we will have to tell you white, because we have had such disastrous experiences with blacks in Charlotte.

"2. They must be able to type 25 words per minute and up, and white because we have had such terrible experiences in Charlotte in the past with the blacks.

"3. We never know when we might need someone, and right now we think we will possible [sic] need someone right away...."

Defendants failed to show by a preponderance of the evidence that race was not the reason for Mayse's demotion and discharge.

Even unaided by the burden-shifting analysis employed in *Bell,* Mayse is entitled to prevail on her Title VII claim. Under the traditional Title VII analysis:

1. First, plaintiff must present a *prima facie* case of discrimination;

2. If a *prima facie* case is established, the defendant must articulate a legitimate, non-discriminatory reason for the challenged decision(s); and

3. If the defendant articulates such a reason, the plaintiff must show it to be pretextual.

In this traditional Title VII analysis, the burden of proof is always on the plaintiff.

In this case, as exhaustively demonstrated above, Mayse has more than met this burden. The preponderance of the evidence clearly requires a finding that Mayse was demoted and discharged not for poor performance, but for her resistance to her employer's racially discriminatory hiring practices and because of her race.

Mayse is entitled to prevail on her Title VII claim.

IT IS THEREFORE ORDERED:

1) That Plaintiffs' motion for a new trial on all claims submitted to the jury in this case is hereby GRANTED;

2) That plaintiff Mayse shall prevail on her Title VII claim;

3) That counsel for plaintiffs, on or before August 9, 1991, shall file and serve appropriate Findings of Fact and Conclusions of Law and a proposed Judgment on plaintiff Mayse's Title VII claim. Unless there are substantial factual errors or inadequacies in the above, the court is willing to go with the above, rather than edit any proposed alternate statement; and

4) That counsel for defendants shall file and serve defendants' response, if any, to the proposed Findings of Fact and Conclusions of Law and Judgment no later than August 26, 1991.